# United States Court of Appeals for the Federal Circuit

---

**REV, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, APTIVE RESOURCES, LLC,**
*Defendants-Appellees*

**DECISIVE POINT CONSULTING GROUP, LLC,**
*Defendant*

---

2022-1759

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01011-PEC, Judge Patricia E. Campbell-Smith.

---

Decided:  January 29, 2024

---

THOMAS SAUNDERS, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, argued for plaintiff-appellant. Also represented by JON DAVIDSON LEVIN, Maynard Nexsen PC, Huntsville, AL.

ERIC JOHN SINGLEY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for all defendant-appellee United States.  Also represented by REGINALD THOMAS BLADES,

JR., MICHAEL GRANSTON, PATRICIA M. MCCARTHY.

JOHN PRAIRIE, Wiley Rein, LLP, Washington, DC, for defendant-appellee Aptive Resources, LLC.  Also represented by JENNIFER EVE RETENER, CARA LYN SIZEMORE.

———————————

Before REYNA, TARANTO, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

REV, LLC ("REV") is a veteran-owned small business that provides software consulting services to private and public entities.  In response to a solicitation ("Solicitation") by the Department of Veterans Affairs ("VA"), REV participated in a bid process in hopes of joining the vendor pool for the VA's Transformation Twenty-One Total Technology-Next Generation ("T4NG") program.  To determine who to add to its vendor pool, the VA conducted a two-step evaluation of the bids it received.  While REV was among the successful participants in the first step, REV was eliminated at the second stage, never making it to the competitive range from which awardees were ultimately selected.

REV filed suit against the VA in the Court of Federal Claims.  Several winning bidders intervened and also became defendants.  The Court of Federal Claims granted the motions of the VA and the intervenor-defendants for judgment on the administrative record.  In doing so, the trial court rejected on the merits REV's critiques of the VA's evaluation of the strength of REV's own proposal.  The court then dismissed for lack of standing REV's challenges to the VA's evaluation of rival bidders' submissions and the VA's establishment of the competitive range.

REV now appeals only the portion of the judgment based on its lack of standing.  We agree with REV that because REV showed it had a greater than an insubstantial chance of securing an award had certain awardees been excluded from the bid process, which REV alleged they

should have been, it has standing. We reverse this portion of the judgment and remand for the Court of Federal Claims to address the merits of REV's claims attacking the VA's assessment of competing bids and its establishment of the competitive range.

I

A

According to the VA's Solicitation, "T4NG is a Multi-Agency, Indefinite Delivery/Indefinite Quantity (IDIQ), Multiple Award Task Order contract with a base ordering period of five years with one five-year option period." J.A. 2055. "The program has a ceiling of $22.3B and supports Contractor-provided solutions of Information Technology (IT), health IT, and telecommunications, to include services and incidental hardware/software for customer requirements that vary across the entire spectrum of existing and future technical environments." *Id.*

As the Solicitation explained, the VA intended to evaluate the offerors[1] who submitted bids in two phases. In the first phase, referred to as "Step One," all offerors were required to submit certain deliverables for a sample task aptly named "Sample Task 1." J.A. 2431; *see also* J.A. 2502 (describing Sample Task 1). To be eligible at Step One, "[o]fferors must [have been] verified in the Vendor Information Pages (VIP) Database as a [Service-Disabled Veteran Owned Small Business] SDVOSB and qualify as a small business . . . at the time of Step One Price Volume submission." J.A. 2431. After evaluating the submissions for Sample Task 1, the VA would establish a first competitive range and select the most highly rated offerors to proceed to the next phase, "Step Two." *Id.*

---

[1] Throughout this opinion we use the terms "offerors" and "bidders" interchangeably.

At Step Two, the remaining offerors were given another sample task, "Sample Task 2." J.A. 2432. As in Step One, "[e]ligible Offerors must [have] be[en] verified in the VIP Database at the time of [their] Step Two proposal submission;" the VA would not "evaluate Step Two proposal submissions from ineligible Offerors." *Id.* The Solicitation explained that following the evaluation of Step Two submissions, the VA would establish another competitive range before selecting the awardees. It also specifically advised that "if the Contracting Officer determined that the number of proposals that would otherwise be included in any competitive range exceeds the number at which an efficient competition can be conducted, the Contracting Officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals." *Id.*

The VA intended to "on-ramp seven (7) SDVOSBs to replenish the pool of SDVOSB[s]," although the VA also expressly "reserve[d] the right to make additional awards or fewer awards if doing so is deemed to be in the best interest of the Government." J.A. 2194; *see also* J.A. 2431. Award decisions were to be "based on the best overall (i.e., best value) proposals that are determined to be the most beneficial to the Government, with appropriate consideration given" to five factors: Technical, Past Performance, Veterans Employment, Small Business Participation Commitment Factor ("SBPC"), and Price. J.A. 2431. While all of these factors would be considered, the VA was explicit that "[t]he Technical Factor is significantly more important than" the other factors. *Id.* Ratings on the Technical Factor were based on the Sample Task 1 ("ST1") sub-factor, Sample Task 2 ("ST2") sub-factor, and Management sub-factor, with "[t]he Sample Task Sub-factor[s] [being] significantly more important than the Management Sub-factor." *Id.*

"To receive consideration for award," the Solicitation continued, "a rating of no less than 'Acceptable' must be

achieved for the Technical Factor, all Technical Sub-Factors, and the SBPC Factor." J.A. 2432. The Solicitation defined an "Acceptable" rating as "[a] proposal that meets all of the Government's requirements, contains at least minimal detail, demonstrates at least a minimal understanding of the problems, and is at least minimally feasible (moderate to high degree of risk)." J.A. 3781. Other possible ratings were "Outstanding," "Good," "Susceptible to Being Made Acceptable," and "Unacceptable." *Id.*

B

Consistent with the Solicitation, the VA made the first competitive range determination after reviewing offerors' submissions for Sample Task 1. A total of 33 offerors, including REV and defendants-intervenors Aptive Resources, LLC ("Aptive") and Decisive Point Consulting Group, LLC ("Decisive Point"), were part of the first competitive range and proceeded to Step Two. After the VA evaluated the submissions for Sample Task 2, all 33 remaining offerors were given an overall technical rating. Twenty-four offerors, including REV, received an "Acceptable" rating, eight offerors received a "Good" rating, and one offeror received an "Outstanding" rating. The following chart shows, in the left-hand column, the overall technical ratings received by the 33 offerors in the first competitive range, as well as the sub-factor ratings, in the adjoining columns. REV is offeror 50. We have added outlining around its ratings for ease of reference.

REV, LLC v. US

| Offeror # | Technical Rating | Sample Task Rating | ST1 | ST2 | Management Rating |
|---|---|---|---|---|---|
| Offeror 001 | A | A | A | G | A |
| Offeror 002 | A | A | A | A | G |
| Offeror 018 | A | A | A | A | A |
| Offeror 023 | G | G | O | A | G |
| Offeror 027 | A | A | O | U | G |
| Offeror 030 | A | A | A | A | O |
| Offeror 034 | A | A | A | A | A |
| Offeror 036 | A | A | A | G | G |
| Offeror 041 | A | A | A | A | A |
| Offeror 042 | A | A | A | A | A |
| Offeror 044 | G | G | G | O | G |
| Offeror 046 | A | A | A | A | A |
| Offeror 047 | A | A | A | A | A |
| Offeror 049 | A | A | A | A | G |
| Offeror 050 | A | A | G | A | G |
| Offeror 052 | A | A | A | A | A |
| Offeror 056 | O | O | O | O | G |
| Offeror 057 | G | G | G | G | G |
| Offeror 060 | A | A | A | G | A |
| Offeror 064 | A | A | A | A | A |
| Offeror 065 | G | G | G | O | A |
| Offeror 067 | A | A | A | A | A |
| Offeror 071 | A | A | G | A | A |
| Offeror 072 | A | A | A | A | A |
| Offeror 073 | A | A | A | A | G |
| Offeror 081 | G | G | G | G | G |
| Offeror 082 | A | A | A | A | A |
| Offeror 083 | G | G | O | A | A |
| Offeror 084 | G | G | G | G | G |
| Offeror 087 | A | A | A | A | G |
| Offeror 091 | A | A | A | G | A |
| Offeror 093 | A | A | A | A | O |
| Offeror 096 | G | G | G | A | A |

J.A. 9060 (outlining added).

After assigning these ratings, the VA established a second competitive range, setting the threshold technical rating for inclusion in that range at "Good." Consequently, the second competitive range included only the nine offerors that had received an overall technical rating of "Good" or "Outstanding." REV, which had received only an "Acceptable" technical rating, was excluded.

REV protested its exclusion from the second competitive range to the Government Accountability Office ("GAO"). The GAO denied the protest. Several days later, the VA's source selection authority selected for award all nine of the offerors that had been included in the second competitive range. J.A. 9.

REV then filed its bid protest in the Court of Federal Claims. Aptive and Decisive Point intervened as defendants.

In its bid protest, REV contended it was the tenth or eleventh highest rated bidder and that several bidders ranked higher than it should not have been. In REV's view, then, a fair process would have resulted in REV being among the top seven bidders and, therefore, ultimately selected to be part of the award pool. More particularly, REV argued to the trial court that the VA's evaluation process had been arbitrary and capricious because the VA had: (1) failed to consider whether two offerors were ineligible for award due to an immitigable organizational conflict of interest, (2) failed to consider offerors' conformance with the Solicitation's requirements, (3) conducted a faulty past performance evaluation, (4) failed to evaluate proposals equally, (5) failed to give REV's proposal a fair reading, and (6) made a flawed competitive range determination.

For ease of analysis, the Court of Federal Claims organized REV's claims into two categories, addressing them in turn. First, the court considered REV's challenges to the VA's evaluation of REV's own bid and its complaint that it had received disparate treatment during the evaluation process. With respect to these issues, the Court of Federal Claims found that REV had standing but further held, on the merits, that the VA's evaluation of REV's proposal was neither arbitrary nor capricious. Specifically, the trial court found that the VA had "[a]ppropriately [e]valuated the [o]fferors' [p]ast [p]erformance," "[a]pplied the [e]valuation [c]riteria [e]quitably," and "[r]easonably [r]eviewed [REV's] proposal." J.A. 15-17.

Next, the court addressed REV's remaining claims, which it characterized as challenging "the agency's actions subsequent to [REV's] elimination" from the process at the second competitive stage. J.A. 19. These included REV's allegations that certain awardees, including Aptive and

Decisive Point, should have been eliminated from the bid process on the grounds that (1) "Aptive made substantive revisions to its Sample Task 1 proposal in response to Amendment 1 'that the Solicitation prohibited,'" (2) "Aptive [and four other awardees] failed to submit [their] required [contractor teaming agreements] (CTAs) as part of its management proposal," (3) in establishing the second competitive range, the VA "neither gave meaningful consideration to all evaluation criteria nor had any reason to conduct discussions," and (4) Aptive and Decisive Point had immitigable organizational conflicts of interest. J.A. 19-22. The Court of Federal Claims did not decide these contentions on the merits because it found REV lacked standing to assert them, as REV could not establish it had been prejudiced by any deficiencies that may have plagued the process after REV's own bid had already been eliminated. Observing that "the VA's evaluation of the [rival] proposals, whether inappropriately revised or missing required components, did not affect the VA's evaluation of plaintiff's proposal," the court concluded that the "agency's actions subsequent to [REV's] elimination from the competition" could not have prejudiced REV. J.A. 19-20.

The Court of Federal Claims added that REV "ha[d] neither explained how – nor pointed to any record evidence that – a change in the VA's evaluation of Aptive's proposal would have changed how the VA viewed [REV's] proposal." J.A. 20. According to the trial court, REV "[s]imply stating that its proposal 'was either next in line for admission to the competitive range or the second company in line,' is insufficient under the multi-award circumstances here" because "there was no guaranteed number of awards, and the exclusion of one offeror from the competitive range did not necessarily ensure the inclusion of another." J.A. 20. Thus, the court concluded, "regardless of the VA's evaluation of the other proposals, plaintiff cannot establish prejudice sufficient to confer standing, and its claim on this point must fail." *Id.* Accordingly, the Court of Federal

Claims granted the defendants' motions for judgment on the administrative record, denied REV's cross-motion for judgment, and dismissed REV's suit with prejudice.

REV timely appealed, challenging only the portion of the trial court's judgment for which the court had held REV lacked standing. Defendant Decisive Point declined to participate in the appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

We review the Court of Federal Claims grant of judgment on the administrative record without deference. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1318 (Fed. Cir. 2003). We review determinations of standing under the Tucker Act *de novo*. *See SEKRI, Inc. v. United States*, 34 F.4th 1063, 1070 (Fed. Cir. 2022). However, underlying factual findings, including prejudice, are reviewed for clear error. *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1357-59 (Fed. Cir. 2018). In post-award bid protests, we review agency actions according to the standard of review set out in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Under the Tucker Act, the Court of Federal Claims has jurisdiction over actions "by an interested party objecting to . . . the award of a contract" by a federal agency. 28 U.S.C. § 1491(b)(1). "To satisfy § 1491(b)(1)'s standing requirements," such a plaintiff "must make two showings." *CliniComp*, 904 F.3d at 1358. "First, [the plaintiff] must show that it is an 'interested party.'" *Id*. This requirement

is a matter of statutory standing only, which is not jurisdictional.  *See CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).  An "interested party" objecting to a contract award is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (internal emphasis and citation omitted).  "And [t]o prove a direct economic interest," such a plaintiff "must show that it had a substantial chance of winning the contract."  *CliniComp*, 904 F.3d at 1358 (internal quotation marks omitted).  In this way, the "interested party" requirement "imposes more stringent standing requirements than Article III."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

"Second, the plaintiff must show that it was prejudiced by a significant error in the procurement process."  *CliniComp*, 904 F.3d at 1358 (internal citation omitted).  The requirement to show prejudice, like the "interested party" requirement, is statutory and not jurisdictional.  *See CACI*, 67 F.4th at 1153 ("[T]he issue of prejudice is no longer jurisdictional unless it implicates Article III considerations.").  "To establish prejudice," a plaintiff objecting to a contract award "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech.*, 316 F.3d at 1319.  Put another way, to show prejudice a disappointed bidder needs to show that "it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest."  *Id.*

### III

To establish statutory standing, and demonstrate it is an "interested party" and sustained prejudice, REV must show at least a substantial chance it would have been a prevailing bidder under the Solicitation had it not been for the errors it contends plagued the procurement process.

We have previously observed that although the interested party inquiry and the prejudice inquiry "may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." *CliniComp*, 904 F.3d at 1358. Hence, while being an interested party and suffering prejudice are separate requirements for standing, the same showing may be pertinent to (and may even satisfy) both.[2]

Here, like the Court of Federal Claims and the parties, we will focus on prejudice. The Court of Federal Claims found a lack of standing based solely on REV's failure to show prejudice. *See* J.A. 19 ("Plaintiff Was Not Prejudiced by Any Alleged Failure to Exclude Intervenor-Defendant Aptive"), 20 ("Plaintiff Was Not Prejudiced by the VA's Alleged Improper Use of Competitive Range Procedures"), 22 ("Plaintiff Was Not Prejudiced by the VA's Addressing a Potential Organizational Conflict of Interest"), 23 ("Therefore, plaintiff cannot establish prejudice sufficient to confer standing, and its claim on this point must fail."). On appeal, the Appellees present no argument for finding lack of standing that is independent of their contention that REV could not have been prejudiced by alleged flaws in the procurement process. In any event, we conclude that REV has demonstrated a substantial chance it would have been one of the awardees had it not been for the errors it alleges contaminated the procurement process, and it has, thereby, under the circumstances presented here, shown both prejudice and that it is an interested party.

---

[2] In general, the "direct economic interest" prong of the interested party analysis is concerned with a bidder's substantial chance to be successful in the procurement process independent of any error, while the prejudice analysis is concerned with the impact the alleged error in the procurement process has on the bidder's chances of succeeding.

In assessing whether a party was prejudiced by purported errors in a procurement process, we must assume that the party will, if permitted to proceed with its claim, prevail on the merits. *See Info. Tech.*, 316 F.3d at 1319 ("[Bid protestor] has established prejudice (and therefore standing), because it had greater than an insubstantial chance of securing the contract *if successful on the merits of the bid protest.*") (emphasis added). This means that our analysis assumes that REV would be successful in its challenges to the implementation of the Solicitation. In particular, we presume that the six bidders whom REV targets as having been improperly placed ahead of it – for reasons including organizational conflicts of interest, failure to submit signed veterans employment certifications, and making improper substantive changes to submissions – should have instead been excluded from the second competitive range, just as REV claims. Based on this assumption, we are persuaded that REV has shown a substantial chance it would have been added onto the T4NG IDIQ contract had it not been for the problems it alleges affected six other offerors.

The record establishes that the VA rated REV as "Acceptable," J.A. 9060, which by the VA's own definition means that REV's proposal met "all of the Government's requirements," J.A. 3781. It further shows that REV received the tenth or eleventh highest rating overall, among the 33 offerors who participated in Step 2. Further, it is undisputed that the VA selected the top nine offerors (that is, *all* of the offerors that were included in the second competitive range) to become part of the T4NG pool, after having indicated in the Solicitation that "[t]he Government *intends to award seven (7) contracts* to verified Service-Disabled Veteran Owned Businesses (SDVOSBs)." J.A. 2431 (emphasis added); *see also* J.A. 15604. Given that we must assume REV would prevail on the merits of its attacks on six of the nine offerors rated more highly than REV, resulting in the exclusion of those six offerors, there is a

substantial chance that the VA would have selected for the pool at least the top seven remaining bidders, a group that would have then included REV.[3]  In this way, REV has shown "it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *Info. Tech.*, 316 F.3d at 1319.

In other words, REV has shown a substantial chance that if the number of offerors who were rated "Good" or "Outstanding" was only three – as it would have been if the six bidders REV attacks actually suffered from the defects REV alleges – then the VA might very well have lowered the minimum rating for being added to the pool to "Acceptable."  In that scenario, REV would have been in the top seven and would, hence, have been in the competitive range at Step 2.  This logic leads, again, to the conclusion that REV has shown a not insubstantial chance of being added to the T4NG pool and, hence, standing.

We reach these conclusions based, in part, on our agreement with REV that the VA's decision on where to draw the line between those who would remain in the process after Step 2 and those who would not was based on the offerors' *relative* ratings.  The VA did not set the floor at "Good" until after it determined how many offerors met or exceeded a "Good" rating.  Thus, while each offeror was initially evaluated independently, the line drawing that eliminated REV – which is the action REV is challenging; its claims are *not* based solely on what happened *after* REV was no longer part of the process, as the Court of Federal Claims mistakenly stated – was based on a relative assessment of the proposals received in Step 2.  *See, e.g.*, J.A. 9061 ("Offerors with an 'Acceptable' Technical Factor rating *were not as strong* when compared to other Offerors, as all

---

[3]    To be precise, the resulting group would consist of the three offerors who finished ahead of REV and whom REV does not challenge, REV, and at least the three others.

other Offerors have a Technical rating of 'Good' or better and . . . *presented stronger technical proposals*.") (emphasis added). This reality adds even more weight to the substantiality of REV's showing: as long as the VA would have adhered to its approach of defining the competitive range by a relative calculus, i.e., the top seven or top nine qualified finishers, REV would likely have ended up in the pool, absent the procedural flaws about which it complains.[4]

We recognize that in the Solicitation the VA reserved the right to adjust the number of awards that it ultimately issued. *See* J.A. 2431. But the VA also noted that it would exercise this discretion "if it is *determined to be in its best interests* for any reason." *Id.* (emphasis added). The record reveals no reason why it would have been in the VA's best interest to add fewer than the initially intended number of offerors to the pool, which was seven, particularly when the genesis of the Solicitation seems to have been the VA's concern about the small number of eligible SDVOSP bidders remaining in the pool, in conjunction with the many contracts remaining to be awarded on what is a massive – $22 *billion* – project. *See* J.A. 10643-44 (contracting officer stating "it is anticipated that a large number of the current SDVOSB contract-holders will no longer qualify as a SDVOSB," so "to replenish the pool of SDVOSB

---

[4] This distinguishes the present case from those cited by Appellees in which bidders who filed technically unacceptable or untimely proposals were found to lack standing. *See, e.g.*, *Labatt Food Services v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009); *Wisconsin Physicians Services Ins. Co. v. United States*, 151 Fed. Cl. 22, 43 (2020). Unlike in those cases, there is nothing objective – like a technical deficiency or untimely submission – that rendered REV's proposal one that "fail[ed] to merit consideration as a finalist." *Wisconsin Physicians*, 151 Fed. Cl. at 31.

contractors, VA determined that it would be in its best interest, and in the best interest of the SDVOSB community, to issue a competitive solicitation, restricted to SDVOSBs, in accordance with the On-ramp clause"); *see also* 38 U.S.C. § 8127 (setting out obligation of agency to make contracting opportunities available to small, veteran-owned, and disabled-operated businesses); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 165 (2016) (explaining that law "requires the Secretary of Veterans Affairs to set more specific annual goals that encourage contracting with veteran-owned and service-disabled veteran-owned small businesses").

The government and Aptive criticize REV's arguments for standing as amounting to nothing more than speculation. To Appellees, the VA's evaluation of the merits of REV's proposal was (and always will be) entirely independent of the VA's establishment of the second competitive range. In their view, REV's proposal was merely "Acceptable," the VA chose to require at least a "Good" overall rating, and once the VA made those determinations REV had no chance whatsoever of being selected. According to the government and Aptive, then, even if REV were to succeed in its challenges to six of the nine successful offerors, the result would simply be that the VA would go forward with just the three remaining offerors, as only those three met or exceeded the VA's threshold requirement of a "Good" rating.

For the reasons we have already given, we are not persuaded by these arguments. We emphasize, once again, the purpose of the Solicitation was to "replenish the pool of SDVOSB" bidders for the T4NG project. J.A. 2194. Nothing in the record supports Appellees' supposition that the VA, having gone to the trouble of reviewing 94 offerors through a two-stage process, and finding (on the assumption that REV is right in its critiques of six highly rated bidders) that only three bidders were rated at least "Good," would have been satisfied to add only that minimal number

of bidders to the pool rather than to dip into the group of additional offerors it had found to be entirely "Acceptable" and add some of them.[5]

Accordingly, we conclude that REV has shown prejudice. Thus, REV has standing to be heard on the merits of its claims against bidders who were rated more highly than REV. We reverse the Court of Federal Claims' judgment for Appellees.

## IV

We have considered the Appellees' remaining arguments and find them unpersuasive. Because REV had standing to challenge the second competitive range and the validity of rival bids, the Court of Federal Claims' grant of judgment to the government and Aptive, and its dismissal for lack of standing, is reversed. The case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**

COSTS

Costs awarded to Appellant.

---

[5] We decline the government's invitation to evaluate the merits of REV's challenges to the higher-rated offerors. The trial court did not reach the merits and the government's contentions may raise factual disputes. It is also possible one or more parties may, on remand, seek to supplement the record. *See* Oral Arg. at 13:35-14:31 (REV counsel stating that record could be reopened to supplement with, for example, testimony of contracting officer).