# In the United States Court of Federal Claims

No. 13-9 C

(Filed March 8, 2013)[1]

```
* * * * * * * * * * * * * * * *    *
AIRCRAFT CHARTER                   *
SOLUTIONS, INC.,                   *
                                   *
              Plaintiff,           *
                                   *
       v.                          *  Post-Award Bid Protest;
                                   *  Cardinal Change Doctrine;
THE UNITED STATES,                 *  Whether an Out-of-Scope
                                   *  Modification of the Awardee's
              Defendant,           *  Contract Occurred; Laches.
                                   *
DYNCORP INTERNATIONAL LLC,         *
                                   *
       Intervenor-Defendant.       *
* * * * * * * * * * * * * * * *    *
```

*David T. Ralston, Jr.*, Washington, DC, for plaintiff. *Frank S. Murray* and *Steven C. Lambert*, Washington, DC, of counsel.

*Daniel Rabinowitz*, United States Department of Justice, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Steven J. Gillingham*, Assistant Director, Washington, DC, for defendant. *Kathleen D. Martin*, United States Department of State, Washington, DC, of counsel.

---

[1]/ This opinion was issued under seal on January 31, 2013. Pursuant to ¶ 8 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. One such redaction was proposed. Brackets ([ ]) identify the redacted portion of this opinion.

*David M. Nadler*, Washington, DC, for intervenor-defendant. *Scott Arnold* and *Erin Wilcox Burns*, of counsel.

———————————————————

**OPINION AND ORDER**
———————————————————

**Bush**, *Judge*.

Plaintiff Aircraft Charter Solutions, Inc. (ACS) filed its post-award bid protest complaint and requests for injunctive relief on January 4, 2013. In its complaint, plaintiff asserted that the Department of State (State) has effected an out-of-scope modification of S-AQMPD-05-C-1103 (State Contract), a contract awarded to DynCorp International LLC (DynCorp) in 2005. DynCorp has intervened in this suit. In this protest, ACS asserts that State is currently ordering "commercial air transportation of passengers and cargo within Afghanistan" from DynCorp under the State Contract, Compl. ¶ 82, in violation of procurement law. ACS asks that the court enjoin this conduct.

The procedural posture of this litigation has been something of a fast-moving target, and requires a brief explanation. The complaint requested four types of relief. The first three types of relief – a preliminary injunction, a permanent injunction, and a declaratory judgment – were focused on preventing DynCorp from providing State with air transportation, of a general nature, of passengers and cargo in Afghanistan. *See* Compl. at 1, 31. The fourth type of requested relief was the entry of an order directing the United States to instead purchase such services, for a time, from ACS. *Id.* at 1-2, 31. The complaint was also accompanied by two motions of relevance here: a motion for the entry of a temporary restraining order (TRO) and a motion for the entry of a preliminary injunction.

Plaintiff's counsel, in the initial scheduling conference held by the court, noted that after January 31, 2013, ACS would no longer have a valid contract with the United States Agency for International Development (USAID) for air passenger and cargo services in Afghanistan. Thus, counsel reasoned, the factors to be considered for a TRO or a preliminary injunction would be fundamentally

altered after that date. The court inquired whether the government could maintain the status quo by extending the USAID contract during the pendency of this protest, but defendant's counsel stated that the government would not do so. The court noted that plaintiff's TRO and preliminary injunction motions could not be decided without briefing of the complex issues presented therein.

The court imposed an expedited briefing schedule utilizing cross-motions for judgment of the administrative record to decide plaintiff's requests for a TRO and a preliminary injunction by January 31, 2013, the termination date of ACS's contract with USAID. The scheduling order permitted the parties to focus primarily on plaintiff's requests for a TRO and a preliminary injunction. *See* Scheduling Order of Jan. 8, 2013, at 2-3. That order also denied plaintiff's TRO motion and its preliminary injunction motion as moot, noting that "plaintiff's motion for judgment on the administrative record will argue for a TRO and a preliminary injunction." *Id.*

The administrative record (AR) of this procurement was filed on January 10, 2013, and a minor correction to the AR was filed on January 14, 2013. In its motion for judgment on the administrative record, plaintiff did not renew its request for a TRO. With the passage of time, plaintiff also abandoned its request that the court direct the United States to purchase air passenger and cargo services in Afghanistan from ACS. *See* Oral Argument Recording (OA Rec.) at 1:13 PM. Instead, plaintiff primarily seeks a preliminary injunction and a permanent injunction of performance of a portion of the State Contract, and continues to press for a declaratory judgment that an out-of-scope modification of the State Contract occurred. Pl.'s Mot. at 1. The briefing submitted by plaintiff and by defendant fully addresses plaintiff's requests for preliminary and permanent injunctive relief, as well as the merits of plaintiff's request for a declaratory judgment. *See* Pl.'s Mot. at 1-2, 57, 59-67; Def.'s Mot. at 1-2, 25-36; Pl.'s Reply at 30.

Thus, the record now before the court permits a resolution of the merits of this protest and plaintiff's requests for injunctive relief. Oral argument was held on January 25, 2013. As discussed below, plaintiff has not prevailed on the merits of its protest, and plaintiff has not shown that injunctive relief should issue. Defendant's and intervenor-defendant's motions for judgment on the administrative record are therefore granted, and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND

**I.     The Solicitation**

The solicitation for the State Contract was formally issued on December 9, 2003, as Solicitation No. S-LMAQM-03-R-0008 (Solicitation). AR at 1, 210; Def.'s Mot. App. B ¶ 5. The contract services were categorized as "[p]rofessional, administrative, and management support services," with the title "[International Narcotics and Law Enforcement Affairs (INL)] Counter-Narcotics Aviation Support Services." AR at 210. Because this protest focuses, in large part, on the expectations of bidders responding to the Solicitation, the court reproduces here the full description of the proposed contract that was provided in a synopsis posted on the FedBizOpps website:

> The U.S. Department of State Bureau for International Narcotics and Law Enforcement Affairs, Office of Aviation (INL/A) is soliciting offerors to provide aviation support services. INL/A is primarily responsible for supporting the U.S. Embassy Country Teams, generally through the Narcotics Affairs Section (NAS) of each embassy, in their effort to assist host nation governments in the eradication and interdiction of illicit crops such as marijuana, coca and opium poppy as mandated in the Foreign Assistance Act. Secondary missions include pipeline security, border patrol, and other related activities. The missions are accomplished via the use of fixed wing and rotary aircraft, and are performed in overseas nations in an environment that at times may be extremely hostile and somewhat austere. These operations are currently performed in Colombia, Bolivia, Peru, and Pakistan, and are anticipated in Mexico and Afghanistan in the near future. The contract will provide all necessary operations and support of this INL/A mission for an initial transition period of up to six months, and a performance period that could extend to 10 years provided the contractor meets performance

4

incentives provided in the associated award term provision. The anticipated annual contract value is approximately $170M, but could vary greatly depending upon how the mission evolves over the performance period. Specific program objectives include: 1. Illicit crop eradication: The contractor will be responsible for both aerial eradication and support for host nation manual eradication of illicit drug crops in designated countries, as well as the interdiction of illicit drug production and trafficking. The contractor will be wholly responsible for aerial eradication, while providing aviation services in support of host nation personnel for the manual eradication and interdiction missions. 2. Aircraft availability: The contractor will provide all necessary logistics and maintenance services to ensure that aircraft are available to perform the many varied tasks as required by local U. S. Embassy Narcotics Affairs Section (NAS) officials. The goal is to provide a lean logistics support system that uses state-of-the-art business practices and streamlined processes that minimize infrastructure requirements in all fields of operation. 3. Training: While host nation personnel should be qualified to perform the required missions, the contractor is responsible for identifying deficiencies and working with the US Government and host nation representatives to develop training programs to rectify any shortfalls. The ultimate goal is to transition all specified mission requirements to host nation personnel at the earliest date possible. 4. Flexibility: Due to the evolving nature of the mission, the contractor must be able to react to changing conditions quickly, with minimal impact to steady state operations. Contract Objectives: All requirements of the Technical Requirements Document must be met. The government is interested in a best value approach that can provide all necessary services efficiently and safely. While there are inherent dangers in counter narcotics activities, every

effort should be made to ensure that operations are conducted in accordance with proven industry and/or government standards.

*Id.* The court reserves a detailed examination of relevant Solicitation terms for the Analysis section of this opinion.

The Solicitation was amended several times, with technical updates and bid submission deadline enlargements not relevant here. The security clearance requirements for contractor personnel were revised. *See* AR at 212-13. State announced plans to hold an "industry day with prospective aviation support service contractors" and their insurers to address issues with the third-person liability insurance requirements of the contract. *Id.* at 1634. Offers were due, per the final Solicitation amendment, by January 11, 2005. *Id.* at 1642.

## II.    DynCorp's State Contract

DynCorp was awarded the State Contract (S-AQMPD-05-C-1103) on May 6, 2005, which, including a six-month transition period, has a potential performance period of ten and a half years. AR at 1643, 1705. The State Contract does not differ significantly from the Solicitation.[2] The foreign countries identified as locations for the delivery of specific services under the contract, as of May 6, 2005, were Colombia, Peru, Bolivia and Pakistan. *Id.* at 1687-1701, 1704, 1706-07. The court reserves further discussion of specific provisions of the State Contract for the Analysis section of this opinion.

## III.    Contract Modifications Relevant to Services Rendered in Afghanistan

The State Contract was soon modified to include Afghanistan operations. In Modification 012 (Mod 12), effective June 28, 2006, funding for the contract was increased and "Afghanistan operations" were added to the contract schedule. AR at 1841. These operations were labeled "Airlift support of INL Counter Drug

---

[2]/ Plaintiff points to the Statement of Work (SOW) of the State Contract as reflecting an interpretation of the Solicitation's requirements by DynCorp and State which is necessarily not identical to the Solicitation itself. Pl.'s Mot. at 15-16 & nn.5-6. In the court's view, the terms of the SOW noted by plaintiff are not indicative of substantial differences between the Solicitation and the State Contract.

programs in Afghanistan." *Id.* at 1845. This was to be a two-pronged effort, according to the statement of work. On the one hand, DynCorp was to provide helicopter support for opium poppy crop eradication efforts; on the other hand, DynCorp was to perform "airlift" support of counter-narcotics programs *and* "various programs of US national interest" in Afghanistan. *Id.*

The focus of this protest is on the modification of the State Contract to include "airlift support of cargo and passenger movement throughout Afghanistan 7 days a week," where these air transport services were no longer restricted to counter-narcotics programs. AR at 1846. In 2006, State estimated that each month in Afghanistan DynCorp would be moving 2000 passengers and 90,000 pounds of cargo, on average. *Id.* at 1899. Mod 12 will be discussed in more detail in the Analysis section of this opinion.

Other modifications of the State Contract which might be relevant here include, for example, the addition of Guatemala operations, in 2006. AR at 1904-07. In 2008, the contract added a DC-3 aircraft for DynCorp's Afghanistan operations. *Id.* at 1916-17. In 2009, an additional 286 passengers involved in the training of Afghan police officers required airlift services, and these services were added to the State Contract. *Id.* at 2170-72. In 2010, three more aircraft were required for DynCorp's Afghanistan operations, along with additional infrastructure to support passenger operations. *Id.* Tabs 16-17. In 2011, eight helicopters were added to the contract for DynCorp's Afghanistan operations. AR Tab 19. Also in 2011, the State Contract added Iraq operations, which included medical evacuation operations using six specially-equipped aircraft provided by State, *id.* at 1968, 1977-80, and "Diplomatic Security High Threat Protection" services, *id.* at 1984-86.

Effective May 9, 2012, a new contract number (S-AQMMA-12-C-1103) was assigned to the State Contract, due to the passage of time and accounting system requirements. AR at 2120, 2134. Later in 2012, the State Contract funded construction of changes to "Camp Alvarado," a United States government facility at the international airport in Kabul. *Id.* at 2135. Recently, in September 2012, the State Contract was modified to add additional aircraft for DynCorp's Afghanistan

7

operations. *Id.* at 2169. The State Contract continues to be performed by DynCorp, and may be extended into 2015 or 2016.[3]

## IV.    ACS's USAID Contract

The United States Agency for International Development (USAID) and ACS entered into a contract, 306-C-00-10-00510-00 (USAID Contract) on January 5, 2010. AR Tab 22. The USAID Contract is for "[a]ir passenger service and aircraft/flight operations management" in Afghanistan. *Id.* at 1999. The base period of the contract was from February 1, 2010 through January 31, 2012. *Id.* at 2004-05. The contract includes three option years, the first of which has been exercised. *Id.* at 2009-11, 2108-09.

The USAID Contract has been modified many times, sometimes changing the size or number of aircraft required for contract services. *See, e.g.*, AR Tabs 23-25, 28, 32-33. These modifications reflect changes in the management of passenger services provided by the United States government in Afghanistan. Other modifications to the USAID Contract similarly reflect changes in passenger services provided by the United States government in Afghanistan. *See, e.g.*, *id.* at 2100 (changing the name of air services referenced in the contract from "USAID Air" to "Embassy Air," and changing the contract requirements for passenger ground transportation vehicles); *id.* at 2103-05 (changing the terminal for Embassy Air at Kabul International Airport from "Ramp C" to "Camp Alvarado"). ACS was informed on December 4, 2012 that the remaining two option years of its contract, which might have prolonged the USAID Contract through January 31, 2015, would not be exercised by USAID. Pl.'s Mot. at 35. With less than a month of performance remaining on its USAID Contract, ACS filed its bid protest in this court on January 4, 2013.

## DISCUSSION

## I.    Bid Protest Jurisdiction

---

[3]/ Although, under the "Period of Performance" provision, it would appear that the State Contract, including option years, expires no later than November 5, 2015, there is also a contract provision, "Option to Extend Services," which appears to permit services to continue six months beyond that date. AR at 1705, 1740.

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citation omitted).

## II. Standard of Review for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005) (*Bannum II*). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

## III. Bid Protest Review

The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC*, 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)). Bid protest standing is limited to those plaintiffs who are "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *AFGE*, 258 F.3d at 1302). In the context of a post-award protest, the protestor must show that it has or had a substantial chance of winning the contract requirement but for the errors in the

9

procurement. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (citing *Myers*, 275 F.3d at 1369-70).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.

*De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the

10

procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract [requirement,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum II*, 404 F.3d at 1351. Plaintiff again bears the burden of proof. *Id.* at 1358. "Prejudice is a question of fact." *Id.* at 1353 (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## IV. Standing

Only a plaintiff possessing a substantial chance of winning a contract for the services that are the subject of its bid protest has standing before this court. *Rex Service*, 448 F.3d at 1307-08. Although neither defendant nor DynCorp challenges ACS's standing to bring this protest, standing is a threshold inquiry that the court must address. *ITAC*, 316 F.3d at 1319. Here, ACS is a contractor currently providing air passenger service in Afghanistan. Should the court enjoin State from purchasing certain airlift services from DynCorp because these are deemed to be out-of-scope of the State Contract, ACS has a substantial chance of receiving a contract for at least some of these airlift services in Afghanistan.[4] For this reason, ACS has standing to bring this bid protest.

## V. Laches

The record shows that DynCorp has been providing airlift services in Afghanistan since 2006. *See* AR Tab 9; Milstead Decl. ¶ 3. ACS, through an affiliate, has been providing air transportation for USAID in Afghanistan since

---

[4] / The court acknowledges that there are alternatives to an award of a contract to ACS should an injunction issue. State contemplates, for example, the award of a sole-source contract to DynCorp, should the court grant any of plaintiff's requests for injunctive relief. *See* Def.'s Mot Ex. A ¶ 16. This contingency plan of the government, however, does not deny ACS standing to bring this protest. In the court's view, ACS has a greater than insubstantial chance of obtaining a contract for passenger transport in Afghanistan if it prevails in this protest. *See ITAC*, 316 F.3d at 1319 (holding that the plaintiff in that case had standing "because it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest").

11

2004.  Reid 1st Decl. ¶¶ 8-9.  Although the record does not establish the earliest date that ACS was aware that DynCorp was providing passenger service for State in Afghanistan, there is no real debate that ACS has known for approximately three years about DynCorp's airlift services.  *See, e.g.*, OA Rec. at 1:22 PM, 1:35 PM-1:40 PM; Reid 1st Decl. ¶¶ 12, 21; Pl.'s Reply at 4 n.1, 6-7; Def.'s Reply at 2-3.  As defendant notes, plaintiff has not explained why it waited three years to file this protest.[5]  Defendant suggests, and the record confirms, that ACS waited until USAID notified ACS on December 4, 2012 that the second option year available under the USAID Contract would not be exercised, and then further delayed filing this protest until January 4, 2013.  This unreasonable delay, defendant argues, constitutes laches and bars plaintiff's bid protest.[6]  Def.'s Mot. at 9-15.  The court agrees.

This court does not frequently apply the doctrine of laches in the bid protest context.  *See, e.g.*, *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 569

---

[5]/ DynCorp, according to plaintiff's own Embassy Air passenger load charts, already had a substantial share in the passenger load of Embassy Air in Afghanistan by mid-2010.  Pl.'s Ex. 6.  A reasonable contractor could not have ignored this competition, and the potential for pursuing relief through a bid protest action, as of June 2010.  Thus, plaintiff has sat on its rights for at least two and a half years.  The court adopts three years, however, as an approximate measure of the delay in the filing of this case, because Embassy Air services provided by DynCorp are acknowledged by the parties to have begun, and to have been publicly known, no later than 2009.  *See* Def.'s Reply at 2-3; OA Rec. at 1:22 PM, 1:35 PM-1:40 PM.

[6]/ Defendant has abandoned its argument that a bid protest filed in 2013 contesting the legality of a contract modification issued in 2006 is barred by this court's six-year statute of limitations.  Def.'s Reply at 2 n.1.  Defendant's abandonment of the statute of limitations issue does not resolve the question, however.  The court must determine its jurisdiction over a case whenever it appears in doubt.  *E.g.*, *Hambsch v. United States*, 857 F.2d 763, 764-65 (Fed. Cir. 1988); *Bayship Mgmt., Inc. v. United States*, 43 Fed. Cl. 535, 536 (1999) (citations omitted).  Here, plaintiff bears the burden of establishing jurisdictional timeliness, and the burden of establishing "accrual suspension" of its claim, by a preponderance of the evidence.  *See, e.g.*, *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (citing *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citation omitted).  The expedited schedule of this protest, however, did not afford plaintiff the opportunity to establish a record sufficient to prove or disprove accrual suspension; thus, on the record currently before the court, and according all favorable inferences to the factual allegations in plaintiff's complaint, the court will not dismiss this case on statute of limitations grounds.

(2004) (*CW Government*) (stating that "we would be reluctant to invoke laches except under extraordinary circumstances"). Plaintiffs' bar recognizes, however, that delay in filing a bid protest carries serious consequences. In some cases, delay constitutes waiver by the plaintiff of a bid protest claim. *See, e.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) (citing 28 U.S.C. § 1491(b)(3) (2006)). In others, delay by the plaintiff in filing a bid protest affects the court's weighing of injunctive relief factors. *See, e.g.*, *Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 212 (2012) ("Undue delay is relevant in determining the extent to which it has magnified the harm to defendant.") (citations omitted). In a few cases, where delay is of an unacceptable magnitude, the doctrine of laches may bar a bid protest. *See, e.g.*, *Reilly v. United States*, 104 Fed. Cl. 69, 78-80 (2012).

There is no doubt that the doctrine of laches may properly be invoked in the bid protest context. *Blue & Gold Fleet*, 492 F.3d at 1314-15 (citing cases). There is also no dispute that defendant, in this case, must demonstrate two elements to establish laches: unreasonable delay on the part of the protestor and economic prejudice to the government. *See, e.g.*, *Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 536 (2003) (citations omitted). In this case, although plaintiff does not specifically concede unreasonable delay, plaintiff has wisely not attempted to argue that a three-year delay in the filing of a bid protest is reasonable.[7] Pl.'s Reply at 3-4. The court finds that the government has met the first prong of a successful laches defense. *See CW Government*, 61 Fed. Cl. at 569 ("In the context of a bid protest, 14 months is a lifetime.").

Turning to the second prong of laches, that of economic prejudice, plaintiff relies heavily, in its reply brief and at oral argument, on the fact that State may well award a sole-source contract to DynCorp if an injunction of a portion of the State Contract issues from this court (were plaintiff to prevail in this bid protest). Pl.'s Reply at 5; OA Rec. at 2:08 PM. At oral argument, plaintiff expanded greatly on its "no prejudice, thus no laches" construct, and made the following main points.[8]

---

[7] Plaintiff's arguments concerning the timeliness of its suit, Pl.'s Reply at 4 n.1, are cursory and unpersuasive.

[8] Plaintiff's arguments regarding prejudice and laches which were first presented at oral argument, and not earlier raised in its reply brief, have arguably been waived. *See, e.g.*, *Office*
continue...

13

First, according to plaintiff, there is no delay-related prejudice to the United States, because an earlier protest resulting in an injunction, in perhaps 2011 or 2012, would have caused the same type and amount of economic prejudice as would a protest and an injunction in 2013. OA Rec. at 1:59 PM. Second, State's investments in recent developments of DynCorp's airlift support services would not be lost, but could be transferred to an awardee in a new, competitive procurement for these services. *Id.* at 2:00 PM-2:01 PM. Third, the type and amount of injunction-related hardships the government might encounter go not to laches, but to the balancing of the hardships prong of the factors to be considered for injunctive relief. *Id.* at 2:06 PM. Finally, plaintiff contends that defendant's arguments that ACS has less capacity to fulfill the challenged portions of the State Contract in 2013 than ACS would have had in previous years are vague and unsubstantiated. *Id.* at 2:07 PM-2:08 PM.

Defendant, on the other hand, has pointed to specific, delay-related economic prejudice that satisfies the second laches prong. For example, the three-year delay in filing this protest parallels a three-year investment in DynCorp's airlift support services in Afghanistan – with additional planes providing the clearest example of costs incurred by the government. Def.'s Mot. at 15. Defendant argues that such investments represent a "continual[] honing and defining [of] the contours of Embassy Air." Def.'s Reply at 4. At oral argument, defendant asserted that it is costly and inefficient to now dismantle the last three years of work devoted to the construction and maintenance of airlift support services in Afghanistan using a specific contractor - DynCorp. OA Rec. at 2:31 PM-2:32 PM. The court must agree. It is not obvious to the court how a competitive procurement, initiated three years later, could recover investments of this nature and magnitude.

Furthermore, the administrative record strongly supports defendant's contention that State's options for responding to a successful bid protest of DynCorp's airlift support services in Afghanistan are less attractive in 2013 than

---

[8]/ ...continue

*Depot, Inc. v. United States*, 95 Fed. Cl. 517, 530-31 (2010) ("Because plaintiff's argument was not presented to the court until oral argument, the court considers this argument waived.") (citation omitted). However, given the rigorous exigencies of the expedited briefing schedule necessitated by this bid protest, the court has considered all of the parties' arguments, even those presented for the first time at oral argument.

they would have been in 2009. Def.'s Mot. at 14. If, indeed, ACS could have provided equivalent airlift support services in 2009, defendant could have removed transport services from the State Contract (and from DynCorp), with less disruption to essential services in Afghanistan and less disruption to its management of existing contracts. Now, in January 2013, the government states that changes in aviation security in Afghanistan reduce the availability of alternatives to just one – a sole-source contract award to DynCorp. *Id.*; Milstead Decl. ¶ 16. Although plaintiff argues that the security concerns of the government regarding ACS are not substantiated, the court must credit the assessment of those concerns presented by the declarant proffered by the government. In the court's view, the cost to the government of this eleventh-hour protest is greater than that of an earlier, timely protest, where cheaper and less disruptive corrective action would have been available.

The court finds that ACS unreasonably delayed its protest and that the government was economically prejudiced as a result. Plaintiff's bid protest is barred by laches, and must be dismissed on these grounds. In the interests of judicial economy, the court considers, in the alternative, the merits of plaintiff's protest, which alleges that a cardinal change of the State Contract occurred when DynCorp began providing air passenger and cargo service in Afghanistan.

## VI. The Cardinal Change Doctrine in the Bid Protest Context

### A. Caselaw

The cardinal change doctrine was developed to discern whether modifications to a government contract were severe enough to constitute a breach of contract by the government. *See, e.g.*, *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978) (citations omitted). A cardinal change "occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Id.* Another influential definition of the cardinal change doctrine states that:

> The basic standard, as the court has put it, is whether the modified job was essentially the same work as the parties bargained for when the contract was awarded. Plaintiff

15

has no right to complain if the project it ultimately constructed was essentially the same as the one it contracted to construct. Conversely, there is a cardinal change if the ordered deviations altered the nature of the thing to be constructed. Our opinions have cautioned that the problem is a matter of degree varying from one contract to another and can be resolved only by considering the totality of the change and this requires recourse to its magnitude as well as its quality. There is no exact formula . . . . Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole. In emphasizing that there is no mechanical or arithmetical answer, we have repeated that [t]he number of changes is not, in and of itself, the test[.]

*Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969) (internal quotations and citations omitted).

The cardinal change doctrine has found use in the bid protest context, as well. In *AT & T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed. Cir. 1993) (*AT & T*), the court explained how the cardinal change doctrine should be applied when reviewing contract modifications to ensure that competition requirements are met by a procuring agency:

This [bid protest] does not ask whether Government modifications breached a contract, but asks instead whether Government modifications changed the contract enough to circumvent the statutory requirement of competition. The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract. In application, these questions overlap. A modification generally falls within the scope of the original procurement if potential bidders would

16

> have expected it to fall within the contract's changes clause.

*Id.* at 1205 (citations omitted).

Perhaps the most common factual scenario that implicates the cardinal change doctrine in bid protests occurs when a disappointed bidder learns of changes in the awardee's contract, and then attempts to invalidate the contract modification on the grounds that the changed contract is not that which was competed by the agency. *See, e.g.*, *AT & T*, 1 F.3d at 1202-03 (services added to awardee's contract trigger protest by disappointed bidders alleging that contract modifications are out of the scope of the original competitive procurement); *CWT/Alexander Travel, Ltd. v. United States*, 78 Fed. Cl. 486, 493-94 (2007) (delays in award and start dates of contract, as well as price increases, alleged to constitute a cardinal change to the contract). Nevertheless, the basic analytical framework of the cardinal change doctrine is the same whenever a protestor alleges that competition has been frustrated by modifications to a contract, *i.e.*, that the procuring agency has impermissibly strayed from the scope of the contract requirements that were advertised to offerors. Regardless of the procurement scenario, the inquiry is fundamentally the same – "whether Government modifications changed the contract [requirements] enough to circumvent the statutory requirement of competition." *AT & T*, 1 F.3d at 1205.

## B.     Statutory Framework

The Competition in Contracting Act (CICA) requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures," unless certain specified exceptions apply. 41 U.S.C.A § 3301(a)(1) (West 2011). It is this statutory imperative for full and open competition that is violated if a procuring agency makes a cardinal change to a contract requirement after accepting bids in response to a solicitation. *See AT & T*, 1 F.3d at 1205 ("[M]odifications outside the scope of the original competed contract fall under the statutory competition requirement."). In other words, a cardinal change to a contract after the contract has been awarded disguises the essential nature of the competed contract and frustrates full and open competition.

## VII.  Analysis of the Merits of ACS's Protest

17

## A. Evolving Missions Are Anticipated in the Solicitation

The court's first task is to determine whether the scope of the Solicitation, as described by the Solicitation's terms and its Changes clause,[9] would have led bidders to expect that the Afghan airlift services disputed here could reasonably be included within the State Contract. *See AT & T*, 1 F.3d at 1205 ("A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause."). Plaintiff advises that in solicitation interpretation, as in contract interpretation, the court must give meaning to all of a solicitation's terms. Pl.'s Mot. at 49-50. The court agrees with plaintiff's view of contract interpretation. Even more apt advice comes from the Federal Circuit, however, which suggests that in bid protests alleging that a cardinal change has occurred, the court must focus on the "the [challenged contract] modification in the context of the contract as a whole." *AT & T*, 1 F.3d at 1207. It is necessary, therefore, to begin with an analysis of the context of services described in the Solicitation.

### 1. The Solicitation's Context

Here, the Solicitation noted that contract services "are currently performed in Colombia, Bolivia, Peru, and Pakistan, and are anticipated in Mexico and Afghanistan in the near future." AR at 104. The court observes, first, that there is no limit to the number of countries that could be served, or to the specific countries that could be served under the State Contract. Thus, unless each of the country-specific tasks enumerated in the Solicitation are identical, a bidder would have realized that services to be performed in newly-added countries might well be different from those provided in Bolivia or Peru, for example.

Upon a close reading of the Solicitation, there are, as it happens, significant differences in the types of services provided in Colombia or Pakistan, for example, from those provided in Bolivia and Peru. Of particular interest here, in Colombia the awardee would be responsible for "Air Assault/Aerial Transportation of

---

[9] The Solicitation, and the resulting State Contract, contained both a fixed-price and a cost-reimbursement Changes clause. AR at 58-59, 1737-38. For ease of reference, the court refers to these clauses as the "Changes clause."

Personnel and Cargo." AR at 187. Two separate provisions of the Solicitation, specific to Colombia in this regard, are relevant:

> The Contractor routinely supports multiple-ship helicopter air assault operations, which involves troop transport helicopters and armed escort helicopters. The Contractor shall maintain the capability to perform special mission tasks to include but not limited to fast rope and rappel operations. At least twice per month, the Contractor will support air assault movement of one counternarcotics battalion (up to 500 personnel strength) and other units.
>
> . . .
>
> The Contractor will be required to transport cargo and personnel to meet mission support requirements in country. Currently, the average monthly movement is 1,500 passengers and 120,000 pounds of cargo. This support is currently provided with the C-27 and supplemented by leased aircraft.

*Id.* It would be reasonable to interpret the first cited provision as describing Air Assault and the second cited provision as describing Aerial Transportation of Personnel and Cargo; it is also reasonable to view or interpret these two provisions as describing similar but not identical aviation support services under the State Contract.[10]

The operations in Bolivia and Peru are not described as including Air Assault services. Furthermore, in Bolivia, no country-specific provision is included for Aerial Transportation of Personnel and Cargo. *See* AR at 194. In Peru, the Aerial Transportation of Personnel and Cargo country-specific provision states that

> The Contractor will be required to transport an average of 30 passengers and up to 6000 pounds of cargo (or a

---

[10]/ The court notes that the first provision describes helicopter missions and that the second describes transport in a C-27 aircraft.

> combination thereof) at least three times a week between
> Lima [and contract performance locations].

*Id.* at 200.  Because operations in Colombia, Bolivia and Peru all differ in the type of Aerial Transportation of Personnel and Cargo services to be provided, a bidder on the State Contract could not assume that aviation support services in a newly-added country would be the same as those described in the Solicitation for these three countries.  In the court's view, a bidder would have assumed that different types of aviation support services could well be required under the contract in Afghanistan.

The court turns its focus to Pakistan.  The Solicitation includes a markedly different description of missions to be performed in Pakistan, as opposed to the missions described for the operations in Bolivia and Peru.  Here are perhaps the most relevant Pakistan-specific terms of the Solicitation, in the "Mission Overview" description:

> The Bureau for International Narcotics and Law Enforcement Affairs, Office of Aviation (INL/A) is primarily responsible to support the U.S Embassy Country Team and NAS, Islamabad to assist the Government of Pakistan (GOP) in the Border Security Project.  Under the auspices of the US Country Team, the Narcotics Affairs Section (NAS) is primarily responsible to assist host nation government to gain and maintain control of the Pakistan-Afghanistan border through the surveillance and interdiction of terrorists, narcotics, arms and other unlawful cross-border activities.  INL/A supports this mission with the Huey IIs and C-208 Cessna Caravans.

AR at 203.

In Pakistan, the State Contract's primary focus is to assist Pakistan "to gain and maintain control of the Pakistan-Afghanistan border."  *Id.*  In Bolivia, in contrast, the "Mission Overview" states that:

20

> The Bureau for International Narcotics and Law
> Enforcement Affairs, Office of Aviation (INL/A) is
> primarily responsible to support the U.S Embassy
> Country Team and NAS, La Paz to assist the Government
> of Bolivia (GOB) to curtail the supply of illegal drugs
> from Bolivia to the United States. INL/A performs this
> mission through the Bolivia Air Program in support of
> the NAS.

*Id.* at 192. The operations in Bolivia differ in many respects from the operations in Pakistan. Similarly, for Peru the "Mission Overview" states that the primary focus of the State Contract will be the "curtailment of the supply of illegal drugs from Peru into the United States." *Id.* at 198. Reasonable bidders would assume from these country-specific descriptions of contract services that the missions to be accomplished in Afghanistan would differ from those in Bolivia and Peru, just as the missions to be accomplished in Pakistan are different from those in Bolivia and Peru.[11]

As the court reads the Solicitation, aviation support services in each country served, and the country-specific primary and secondary missions of INL/A, would differ. This context is crucial to the determination of the scope of the State Contract. The court now turns to the parties' dispute as to the scope of the Solicitation.

## 2. The Solicitation's Scope

Plaintiff and defendant fundamentally disagree as to the scope of the Solicitation. To summarize plaintiff's argument, five main points appear to provide the foundation upon which plaintiff's reading of the Solicitation rests.[12] First, the Solicitation must be narrowly construed as seeking, at bottom, a counter-

---

[11]/ This expectation of differing missions in Afghanistan is not only logical due to the country-specific missions described in the Solicitation, but due to the unique role the United States government was fulfilling in Afghanistan in 2003.

[12]/ While plaintiff's approach attacks the text of the Solicitation on many fronts, this selection of five main points reflects, in the court's view, plaintiff's strongest arguments.

21

narcotics contractor for counter-narcotics missions.[13]  *See, e.g.*, Pl.'s Mot. at 4 n.2 (suggesting that the primary and secondary missions noted in the Solicitation could be referenced by the term "counternarcotics mission"); 46 ("The Counter-Narcotics Solicitation was precisely that:  a solicitation for aviation services in support of designated counternarcotics missions.").  Second, all references in the Solicitation to flexibility, additional tasks or evolving missions must be construed to include a significant limitation – that all services added to the State Contract would necessarily have a counter-narcotics focus.  *See id.* at 49 (arguing that the Solicitation's reference to flexibility must be interpreted as stating that "flexibility must be exercised within the confines of the Counternarcotics Solicitation and does not authorize INL/A to acquire wholesale new airlift requirements materially different from the services solicited in the original competion"); Pl.'s Reply at 9 (arguing that "broad-based air carriage of personnel or cargo . . . unrelated to counternarcotics activities was beyond the scope of the contract's counternarcotics support mission").  Third, the Solicitation's lack of a broad catch-all category of services, or reference to any specific passenger-related services such as ticketing or reservations, would have led offerors to assume that passenger service was beyond the scope of the State Contract.[14]  Pl.'s Mot. at 47-48.  Fourth, aerial transportation of personnel and cargo, a category of services described in the Solicitation, cannot be interpreted to include airlift services that do not have an emergency or military nature, or that do not have a counter-narcotics purpose.  *Id.*; Pl.'s Reply at 14-15. Fifth, the Solicitation must be viewed as imbued with a strong nationalization

---

[13]/  Plaintiff retreated somewhat from this position at oral argument.  *See* OA Rec. at 1:27 PM-1:28 PM (acknowledging that the Solicitation contains more than just counter-narcotics missions).  Nonetheless, plaintiff insisted that the counter-narcotics "context" of the Solicitation should color any interpretation of the Solicitation as a whole.  *Id.* at 1:29 PM.

[14]/  The court has also considered plaintiff's other arguments parsing a multitude of terms in the Solicitation, but finds these arguments insufficient to alter the court's view of the scope of that document.  To cite just one example, plaintiff argues that no passenger aircraft suitable for airlift services in Afghanistan were listed in the Solicitation.  Pl.'s Mot. at 6, 55.  Defendant notes that the Solicitation's terms allowed for the addition of aircraft (and new types of aircraft), and that some aircraft listed in the Solicitation are indeed capable of passenger transport in Afghanistan.  *See* Def.'s Mot. at 23 (citing AR at 80, 169, 2005).  Plaintiff's reply brief did not rebut defendant's arguments in this regard.  The court rejects plaintiff's contention that its analysis of specific terms in the Solicitation, "recounted in painstaking detail," Pl.'s Reply at 15, shows that the Solicitation's scope did not include airlift support services of the type provided by DynCorp in Afghanistan.

22

mission, where the contractor would provide training to host country nationals in furtherance of achieving a transition to counter-narcotic aviation support services being provided by the host countries and not by the United States.  Pl.'s Mot. at 51-52; Pl.'s Reply at 9-10, 14.  Because DynCorp's performance of airlift services in Afghanistan includes no training component, plaintiff argues, these services must be beyond the expectations of offerors responding to a Solicitation characterized by a strong nationalization mission.  Pl.'s Mot. at 51-52.

Defendant, on the other hand, views the Solicitation as denoting a procurement for a broad range of aviation support services.  Defendant points to language listing a multitude of services to be provided under the State Contract, such as this introductory statement of technical requirements:

> This document provides the technical requirements for the Bureau for International Narcotics and Law Enforcement Affairs, Office of Aviation (INL/A) Contractor Logistical Support (CLS) services for eradication and interdiction of illicit drugs, training of Contractor and host nation personnel, movement of personnel and equipment, reconnaissance, search and rescue, medical evacuation and ferrying of aircraft.

AR at 168.  The government also points to terms of the Solicitation that are expansive and broad, rather than narrow and specific.  *See* Def.'s Mot. at 19.  Finally, defendant argues that the mention of "'extremely hostile'" and "'very austere'" conditions in the Solicitation would have led offerors to presume that contract missions would evolve as conditions required.  *Id.* at 20 (quoting AR at 168).

Although both plaintiff's and defendant's positions reflect, at times, somewhat extreme interpretations of the Solicitation,[15] the court cannot disagree

---

[15]/  Plaintiff's efforts to extract meaning from Solicitation terms are, in some instances, strained.  The grouping of Air Assault and Aerial Transportation of Personnel and Cargo in one paragraph of the Solicitation, for example, does not necessarily evince a "linkage" of the type posited by ACS.  *See* Pl.'s Mot. at 48 (citing AR at 171); *see also* Pl.'s Reply at 15 & n.10.  Defendant, for its part, appears to find remarkable breadth in the Solicitation's description of

continue...

with the government's ultimate conclusion that aerial transportation of passengers and cargo, at least in the context of protecting the interests of the United States in Afghanistan, is within the scope of the Solicitation. First, as noted *supra*, different types of aerial transportation are required in the country-specific portions of the Solicitation, and different missions are required to be accomplished in different nations. Second, there is enough flexibility in the Solicitation's terms to support aerial transportation of passengers and cargo in hostile environments. *See, e.g.*, AR at 166 ("Secondary missions include pipeline security, border patrol, and other related activities."); *id.* ("The anticipated annual contract value is approximately $170M, but could vary greatly depending upon how the mission evolves over the performance period."); *id.* at 167 ("Flexibility: Due to the evolving nature of the mission, the contractor must be able to react to changing conditions quickly, with minimal impact to steady state operations."); *id.* at 169 ("The Department of State anticipates expansion of the program, to include other aircraft types and or quantity, and additional missions (counter-narcotics and expanded authorities) into other countries."). Third, the court finds that the provisions in the Solicitation governing Aerial Transportation of Personnel and Cargo, alongside reference to other operations of considerable variety, provide notice to reasonable offerors that airlift support services in Afghanistan are contemplated under the terms and the Changes clause of the Solicitation.

Plaintiff argues that "references" to the Aerial Transportation category of services in the Solicitation are determinative of the expectations of offerors as to airlift support services:

> The issue before the Court, then, is whether the references in the Counternarcotics Solicitation to "aerial transportation of personnel and cargo" would have sufficiently alerted prospective offerors to the possibility that the government would use the resulting contract as a vehicle to obtain from its counternarcotics contractor full-scale commercial-equivalent passenger and cargo services, including an online ticketing/reservation

---

[15]/ ...continue
"VIP missions." Def.'s Mot. at 20, 24. The court is not persuaded by these zealous attempts to find textual support for the parties' positions where there is little or none to be found.

system, under which the contractor would serve all the in-country air transportation needs of diplomacy and development personnel, regardless of any connection to the specific counternarcotics missions identified in the Solicitation.

Pl.'s Reply at 14 (emphasis removed).  The court does not agree with plaintiff's framing of the decisive issue for the merits of this protest.  It is the Solicitation as a whole, and especially the comparison of the context of the Solicitation with the contract modification challenged here, that must be weighed by the court.  *See AT & T*, 1 F.3d at 1207.  The Solicitation, aside from its important references to Aerial Transportation of Personnel and Cargo, exhibited variety in the description of the operations in Colombia, Bolivia, Peru, and Pakistan, and significant references to flexibility and anticipated changes.  Thus, although the Aerial Transportation category of services is indeed important in the court's analysis, the court must construe the Solicitation as a whole.

The court has reviewed the relevant sections of the Solicitation and cannot agree with plaintiff that secure air transportation of passengers and cargo, in the hostile and austere conditions found in countries such as Afghanistan, was not included within the Solicitation's scope.  The Technical Requirements Document (TRD) describes "Aerial Transportation of Personnel and Cargo," in relevant part, in this manner:

> Aerial transportation is defined as the movement of personnel and cargo via rotary and/or fixed wing aircraft. . . .  The Contractor shall provide mission capable aircraft and mission qualified crews to perform the transportation mission.

AR at 171.  Other operations, or missions,[16] include search and rescue, medical evacuations, and VIP missions.  AR at 171-72.  As an introduction to these operations, the Solicitation states that

---

[16]/  These terms are used interchangeably in this section of the Solicitation.  *See* AR at 170 ¶ 3.3.

> [t]he types of missions the Contractor will be required to
> perform are listed below. We anticipate that mission
> profiles may change and the Contractor shall be capable
> of adapting to these changes.

AR at 170. The court has considered: (1) the performance period of more than ten years for the State Contract; (2) the types of operations specified in the TRD; (3) the variety of missions described in the Solicitation; (4) the differences in the country-specific portions of the Solicitation; (5) the multiple and prominent references to flexibility, adaptation and change; and, (6) the unique challenges of protecting the interests of the United States in Afghanistan. In view of the context of the State Contract set forth in the Solicitation, the court finds that a reasonable offeror would have anticipated that in a country such as Afghanistan, secure air transportation of passengers and cargo would be within the scope of the State Contract.

There has been, therefore, no cardinal change effected by the addition of airlift support services in Afghanistan to the State Contract.[17] Thus, even if plaintiff's bid protest were not barred by laches, the protest filed by ACS has not succeeded on the merits. Because plaintiff has not shown that a cardinal change of the State Contract occurred, the court need not consider whether ACS was prejudiced by Mod 12 and the addition of airlift support services in Afghanistan to the State Contract. *See Bannum II*, 404 F.3d at 1351 (stating that the prejudice inquiry is triggered by the plaintiff's success on the merits of its protest).

## VIII. Injunctive Relief Factors Weighed

Although the court has dismissed this protest as barred by the doctrine of laches, and has found that plaintiff has not succeeded on the merits of its bid

---

[17]/ In reaching this conclusion, the court does not ignore plaintiff's reference to a document which contains a statement that the State Contract's scope has grown and changed over the years. *See* Pl.'s Mot. at 1, 45-46. This document is not within the administrative record, as discussed *infra*. Even if it were in the record, the court considers the document irrelevant to the court's analysis of the Solicitation and the changes effected by Mod 12. Because Mod 12 is a permissible change under the Changes clause of both the Solicitation and the State Contract, a statement regarding the "scope" of the State Contract cannot determine the outcome of this suit.

protest, the court nonetheless examines plaintiff's requests for preliminary and permanent injunctive relief, again for the sake of judicial economy.

> The factors to consider before issuing a permanent injunction are:

> > (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)). For a preliminary injunction, plaintiff would have to show a likelihood of success on the merits, but the other factors remain the same. *Id.*

## A.     Success on the Merits

Here, plaintiff has not succeeded on the merits, so the first factor weighs against any injunctive remedy. Indeed, this court has stated that without success on the merits, the injunctive relief inquiry is over. *See, e.g.*, *Sci. Applications Int'l Corp. v. United States*, No. 11-690C, 2012 WL 5869366, at *49 (Fed. Cl. Nov. 19, 2012) ("In that [the protestor] has not prevailed on the merits of its substantive claims, the first hurdle prerequisite to injunctive relief, inquiry is over."); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 700 (2010) ("After all, success on the merits is a condition precedent to granting a permanent injunction."). Nonetheless, the court will briefly discuss the other injunctive relief factors as they apply to plaintiff's requests for relief in this bid protest.

## B.     Irreparable Harm

The types of economic harm described by ACS, should an injunction not issue, would normally constitute irreparable harm, in the court's view. Plaintiff asserts that ACS would suffer loss of revenues, both from the loss of opportunity to compete for the airlift support services in Afghanistan, and from earnings that

might be available under its USAID Contract if extended, of approximately $[ ] in 2013, or [ ]% of its annual gross income.  Pl.'s Reply at 22.  Plaintiff also argues that non-monetary losses, flowing from its withdrawal from Afghanistan and lay-offs of personnel, would be irreparable, as well.  Pl.'s Mot. at 60.  The court must consider, however, whether plaintiff's allegedly irreparable economic harms are fully incidental to the purported procurement violation that is the focus of this bid protest.  They are not.

When significant delay in bringing a protest has contributed to the irreparable nature of the injuries alleged by the plaintiff, any self-inflicted harm should not be considered irreparable for purposes of the injunctive relief analysis.  *See GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 229 (2011) (*GEO Group*) (noting that it is not this court's role to rescue protestors from their "own ill-fated tactical decisions") (citations omitted).  The imminent loss of ACS personnel at the end of this month, or soon thereafter,[18] is largely due to ACS's decision to delay its protest until January 2013.  As to ACS's economic losses, these, too, might have been less substantial in 2009 or 2010.  Although ACS has made a credible case for at least some irreparable economic harm not of its own making, the court finds that this factor weighs only slightly in plaintiff's favor.

## C.    Balance of Hardships

As to the balance of the hardships, the court weighs the economic and non-economic harms to ACS, should an injunction not issue, against the hardships that would be inflicted on the government were the court to enjoin DynCorp's performance of airlift support services in Afghanistan under the State Contract.  The harms to ACS have been described, above, and some of the hardships that would affect the government have been alluded to, indirectly, in the laches discussion in this opinion.  Plaintiff, both in its briefs and at oral argument, has suggested that there are a number of creative ways that the government can reduce the hardships flowing from an injunction, so that no hardships are experienced by the government.  Perhaps the most intriguing of these suggestions, and there are many, is that DynCorp could continue to perform air passenger service in Afghanistan as a subcontractor to ACS.  OA Rec. at 1:21 PM.  More generally,

---

[18]/  The termination date of ACS's performance under the USAID Contract may be extended, according to plaintiff.  *See* Reid 2d Decl. ¶ 11.

28

plaintiff insists that ACS can perform the required airlift support services as an alternative to DynCorp. Finally, plaintiff notes that State has indicated that it would resort to a sole-source contract with DynCorp, in the event of an injunction, to prevent an unacceptable interruption of essential services; ACS argues that this option eliminates any potential hardship to the United States. OA Rec. at 2:17 PM.

The government's primary argument in this regard is that ACS is not an acceptable alternative to DynCorp, under the security challenges in Afghanistan at this point in time and going forward, and that an injunction will cause significant hardship to the government. Def.'s Mot. at 32-35; Def.'s Reply at 13-15. The court credits the record evidence which supports defendant's arguments regarding the need for DynCorp, rather than ACS, to continue as the provider of airlift support services in Afghanistan. The court also agrees with the government that an injunction will cause greater hardship to the government than the hardships posited by plaintiff in the absence of an injunction. As noted earlier in this opinion, a court-imposed dissolution of the Embassy Air model of services, built by State and DynCorp over the last six years, would necessarily entail economic, programmatic and administrative hardships of significant magnitude.

The court is not persuaded by plaintiff that a potential decision by State to offer a sole-source contract to DynCorp, in the event of an injunction, tips the balance of hardships in plaintiff's favor. This court has repeatedly held that a protestor's delay in bringing a protest must be accounted for in the balance of hardships inquiry. *See, e.g.*, *GEO Group*, 100 Fed. Cl. at 230 (weighing the protestor's decision to delay filing its protest in this court in the balance of hardships inquiry); *Elmendorf*, 105 Fed. Cl. at 210 (noting that "[e]quity aids the vigilant, not those who slumber on their rights," in a case where the protestor waited until "28 days before the end of [its] last option extension to file its complaint"); *Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 731 (2004) (stating that "a bid protest pressed well into contract performance tips the scale [weighing injunctive relief factors] in favor of the awardee" (citing *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 n.9 (D.C. Cir. 1982))), *aff'd*, 404 F.3d 1346 (Fed. Cir. 2005). In these circumstances, the balance of hardships weighs in the government's favor.[19]

---

[19]/ The court notes that a sole-source contract award to DynCorp is not cost-free: the

continue...

### D. Public Interest

Finally, plaintiff and defendant disagree as to whether or not the public interest would be served by an injunction, in these circumstances. Plaintiff invokes the benefits to the public interest when full and open competition prevails. Pl.'s Mot. at 65-66; *see also id.* at 64 (stating that "the public interest in protecting the integrity of the procurement system easily trumps national security in the present case"). Defendant suggests that the public interest is served, in this case, by the court's abstention from judicial interference in the contracting function. Def.'s Mot. at 35. Here, since there has been no violation of procurement law, the public interest is best served by withholding the injunctive relief requested by plaintiff.

The court notes, too, that defendant has invoked national security concerns in Afghanistan. By statute, the court must give due consideration to these concerns. 28 U.S.C. § 1491(b)(3). In the case of secure aerial transportation of passengers and cargo in Afghanistan, the national security concerns expressed in the Milstead declaration are compelling. *See* Milstead Decl. ¶¶ 4-16. This court often takes national security concerns into consideration as it weighs the public interest injunctive relief factor. *See, e.g.*, *Elmendorf*, 105 Fed. Cl. at 212; *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 131 (2011); *RhinoCorps Ltd. v. United States*, 87 Fed. Cl. 261, 281 (2009). Here, the public interest in national security weighs against a court intervention in the airlift support services provided by DynCorps in Afghanistan.

Weighing all four injunctive relief factors, the court finds that these factors do not favor granting plaintiff a preliminary or a permanent injunction.

---

[19]/ ...continue
procedure is encumbered with administrative burdens; a sole-source award may trigger, as plaintiff notes, protests in this forum, or at the Government Accountability Office; in addition, a sole-source award protest carries with it the risk of forum-imposed delays which could affect contract performance in Afghanistan. The court would be remiss in its duty to consider the national security concerns raised by defendant, Def.'s Mot. at 34-35; Def.'s Reply at 13-15; OA Rec. at 2:58 PM, if it did not consider the hardships that would accompany a sole-source award to DynCorp. The court therefore finds that, for this additional reason, the hardships to the government, if an injunction should issue, outweigh the hardships identified by plaintiff, if the court should stay its hand.

## IX.  Motions to Supplement the Record

### A.  *Axiom*

In *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009), the Federal Circuit identified the acceptable circumstances under which the administrative record may be supplemented in a bid protest.  The *Axiom* panel criticized a decision by this court which permitted supplementation of the administrative record in a bid protest, and criticized the trial court's over-broad reliance on *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), a case which provides a list of justifications for the supplementation of the administrative record of an agency action.  *Axiom*, 564 F.3d at 1379-81.

The court notes that the *Axiom* panel adopted a restrictive standard for supplementation of the administrative record in a bid protest, and favorably cited *Murakami v. United States*, 46 Fed. Cl. 731 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005).  *Axiom*, 564 F.3d at 1380.  The *Axiom* standard for supplementation of the administrative record in a bid protest is a direct quotation from *Murakami*, stating that "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735).  The Federal Circuit relied on the cases cited by this court in *Murakami* to conclude that "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'"  *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735 and citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  The thrust of the *Axiom* decision, and *Murakami*, is that this court must exercise restraint when considering whether or not to supplement the administrative record in a bid protest.  *See id.* (favoring a "more restrictive approach" and questioning the vitality of *Esch*) (citations omitted); *Murakami*, 46 Fed. Cl. at 735 (stating that the construction of the *Esch* justifications for allowing supplementation of an administrative record should be "extremely limited") (citations omitted).  For these reasons, this court has carefully considered each document proffered by the parties as a potential supplement to the administrative record.

**B.    Documents Proffered by the Parties for Consideration by the Court**

The court acknowledges that there is some confusion as to the term "administrative record." Sometimes such a term denotes only the contemporaneous record of agency decision-making that is reviewed by the court under a deferential standard. *See, e.g*, *Axiom*, 564 F.3d at 1380 ("The purpose of limiting review to the [contemporaneous] record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'") (citation omitted). At other times, the term "administrative record" is meant to include not only those contemporaneous documents, but also records of subsequent protest-related events. *See* RCFC App. C ¶ 22(s), (u). "Administrative record" might also broadly refer to all of the documents relied upon by the court, once an administrative record has been filed and appropriately supplemented, in granting a motion for judgment on the administrative record. *See, e.g.*, *RhinoCorps*, 87 Fed. Cl. at 273 n.13 (noting that declarations proffered by the agency and the protestor often must be permitted to supplement the administrative record to afford effective judicial review of national security and national defense issues, as well as the weighing of injunctive relief factors). It is this broader definition that the court has used in the supplementation disputes discussed here. The court has applied the principles of *Axiom* to establish a record required for the effective review of both the merits of this protest, as well as plaintiff's requests for injunctive relief and defendant's laches defense.

To the extent that the briefing of plaintiff's three motions regarding the content of the administrative record may have proceeded under a different definition, or definitions, of the term "administrative record," the parties' positions on each proffered document are nonetheless clear. The court has carefully considered any request that the court consider and rely on a particular document that was not filed by defendant on January 10, 2013 as a component part of the administrative record. Any document that, pursuant to the instant opinion and order, now supplements the administrative record originally filed on January 10, 2013, is part of the administrative record because that document was deemed necessary to the court's effective review of this bid protest.

On plaintiff's side, there were three motions to supplement or expand the administrative record:  Plaintiff's Motion to Compel Agency to Complete the

Administrative Record and for Additional Remedial Action, filed January 11, 2013; Plaintiff's Motion to Supplement the Administrative Record, filed January 15, 2013; and, Plaintiff's Second Motion to Supplement the Administrative Record, filed January 22, 2013.[20] Of particular note are two declarations of Mr. Robin Reid, Chairman of ACS. Mr. Reid's first declaration is Plaintiff's Exhibit 1 (Reid 1st Decl.), filed January 15, 2013. Mr. Reid's second declaration is Plaintiff's Exhibit 7 (Reid 2d Decl.), filed January 22, 2013. Plaintiff also sought the supplementation of the record with certain State Contract documents not included in the administrative record filed January 10, 2013, as well as other documents which, in plaintiff's view, provide insights into the disputes in this case.

On defendant's side, there were two declarations filed on January 18, 2013 as appendices to defendant's motion for judgment on the administrative record. The first is a declaration by Mr. Eric N. Milstead, an administrator at the U.S. Embassy in Kabul. Def.'s Mot. App. A (Milstead Decl.). The second is a declaration of the contracting officer for the State Contract, Mr. Patrick J. Murphy. Def.'s Mot. App. B (Murphy Decl.). Defendant did not oppose three of plaintiff's requests for record supplementation as to State Contract documents that were either inadvertently omitted from, or mistakenly included in, the administrative record.

### C.    Proper Supplements to the Administrative Record

Three of the declarations submitted by plaintiff and defendant, the Reid and Milstead declarations, bear on the injunctive relief factors weighed by the court, as well as defendant's laches defense. The Murphy declaration presents the history of modifications to the State Contract, and goes to the cardinal change issue. These declarations are necessary for effective judicial review, and properly supplement the administrative record.

As to one of the uncontested contract documents proposed as a supplement, AR Tab 37 properly substitutes a final contract modification for a draft modification, AR Tab 14, and is now incorporated into the administrative record through the filing of a Corrected Administrative Record on January 14, 2013.

---

[20]/ Plaintiff's later motions to supplement the record have rendered its motion filed January 11, 2013 moot. *See* OA Rec. at 2:19 PM-2:21 PM.

Similarly, Plaintiff's Exhibit 2 and Exhibit 3, uncontested by defendant, are State Contract documents which are relevant to the cardinal change issue, and these exhibits properly supplement the administrative record. Over defendant's objections, the court also permits supplementation of the record with plaintiff's Embassy Air Passenger Load chart, Pl.'s Ex. 6, which provides a graphic display of the competition of ACS and DynCorp, from May 2010 to December 2012, for Embassy Air passengers in Afghanistan. This chart goes to the cardinal change issue, the laches issue, as well as the weighing of the injunctive relief factors, and has been deemed by the court to be helpful to its judicial review of this protest.

### D.      Improper Supplements to the Administrative Record

All other documents submitted and proposed by plaintiff, Pl.'s Exs. 4-5, 8-13, must be rejected as improper supplements to the administrative record. The court found nothing in these documents which advanced the court's analysis of the cardinal change issue. As to the email correspondence proposed by plaintiff as a supplement to the administrative record, Pl.'s Exs. 9-10, these two emails are not contract administration documents that would shed light on changes in the State Contract. Although plaintiff urged the court to rely on Plaintiff's Exhibit 10 for the weighing of the injunctive relief factors, Pl.'s Reply at 25-27, the court relied, instead, on sworn declarations of obvious weight rather than on emails of dubious relevance.

### E.      "Table 3-2" and the Security Clearance Issue

The only other substantive dispute over a document not included in the administrative record concerns what plaintiff refers to as "Table 3-2 to the [State] Contract." *See* Pl.'s Compel Mot. Att. A ¶ 6; *see also* Pl.'s Consolidated Supplementation Reply at 7; OA Rec. at 2:12 PM-2:14 PM, 2:19 PM. This document is cited in the State Contract as "Job Qualifications Table 3-2 (Appendix 1)," and is identified as a reference document providing information regarding contractor personnel "security clearance requirements." *See* Pl.'s Ex. 3 at 46. Plaintiff's position is that this document would have shed light on the security clearances required of DynCorp staff providing airlift support services in Afghanistan, and would have shed light on the dispute between the parties over the ability of ACS to perform airlift support services in Afghanistan. Defendant's position is that the Table 3-2 was never incorporated into the contract by

34

modification, and thus, Table 3-2 is irrelevant to the cardinal change issue. Def.'s 1st Supplementation Resp. at 6. The court agrees with defendant that Table 3-2 would not have aided the court's review of the cardinal change issue.

It is a closer question, however, whether the security clearance issue, as that issue might contribute to the weighing of the four injunctive relief factors and the government's laches defense, would have been better understood by the court if Table 3-2 were in the record. The government argues that the Milstead declaration is authoritative on the security clearance issue, and that the assertions contained therein certainly outweigh the assertions in the second Reid declaration.[21] Def.'s Reply at 15 & n.4; OA Rec. at 3:00 PM. Plaintiff asserts that the security clearance issue is not clearly addressed in the record, and that Table 3-2 "would be virtually controlling" on the security clearance issue. OA Rec. at 1:21 PM, 2:14 PM.

The court believes that the security clearance issue is adequately presented in the parties' declarations and the contract documents themselves. There is an obvious difference between the discussion of security clearances in the State Contract and the minimal discussion of security clearances in the USAID Contract. *See* AR at 1682, 2027-28, 2086-87; Pl.'s Ex. 3 at 46. Given the marked differences between the security clearance requirements in the two contracts, the record contains enough information, once the declarations proffered by the parties have been considered, to resolve the parties' dispute as to ACS's readiness to obtain security clearances to replace DynCorp as the airlift support services contractor in Afghanistan. The Milstead and Reid declarations, which necessarily rely on contract requirements regarding security clearances *and* on direct knowledge of conditions in Afghanistan, fully explore the security clearance issue; the absence of Table 3-2 does not frustrate effective judicial review of this issue.[22]

---

[21]/ The court must agree. *Compare* Milstead Decl. ¶¶ 7-10, 13, 16 *with* Reid 2d Decl. ¶¶ 36-38. The court notes that even if Plaintiff's Exhibit 10, an email which mentions security clearances, were permitted to supplement the administrative record, the declaration of Mr. Milstead, whose "duties include administrative oversight of aviation operations in support of the Embassy's missions" in Afghanistan, Milstead Decl. ¶ 1, would still be more persuasive on the security clearance issue.

[22]/ The court rejects plaintiff's request, presented for the first time at oral argument, that the court draw an adverse inference from the government's refusal to include Table 3-2 in the administrative record. OA Rec. at 2:14 PM-2:15 PM. As stated *supra*, the court does not agree

continue...

## CONCLUSION

This bid protest is dismissed due to laches on the part of plaintiff. In the alternative, this protest is dismissed because there was no out-of-scope modification of the State Contract in the provision of airlift support services by DynCorp in Afghanistan. The court has also examined the four factors required for an injunction to issue, and finds that these factors do not weigh in favor of either a preliminary or a permanent injunction. Plaintiff's failure to succeed on the merits of its protest also denies plaintiff a declaratory judgment in its favor. This bid protest must be dismissed for the above reasons.

Accordingly, it is hereby **ORDERED** that:

(1)    Plaintiff's Motion to Compel Agency to Complete the Administrative Record and for Additional Remedial Action, filed January 11, 2013, is **DENIED** as moot;

(2)    Plaintiff's Motion to Supplement the Administrative Record, filed January 15, 2013, is **GRANTED in part**, as to Plaintiff's Exhibits 1-3 and 6, and **DENIED in part**, as to Plaintiff's Exhibits 4-5;

(3)    Plaintiff's Motion for Leave to Exceed Page Limits of Memorandum, filed January 15, 2013, is **GRANTED**;

(4)    Plaintiff's Motion for Judgment on the Administrative Record and Entry of Injunctive Relief, filed January 15, 2013, is **DENIED**;

(5)    Defendant's and Intervenor-Defendant's Motions for Judgment on the Administrative Record, both filed January 18, 2013, are **GRANTED**;

---

[22]/ ...continue
with plaintiff that the absence of Table 3-2 frustrates effective judicial review of plaintiff's requests for injunctive relief, or of the government's laches defense. The court notes, further, that even if an adverse inference were drawn against defendant on the security clearance issue, this one component of the arguments made by the government as to laches and injunctive relief is not so crucial that the weight of evidence would tip in plaintiff's favor. The court would still rule in favor of the government on laches, and would still deny plaintiff injunctive relief.

(6) Plaintiff's Second Motion to Supplement the Administrative Record, filed January 22, 2013, is **GRANTED in part**, as to Plaintiff's Exhibit 7, and **DENIED in part**, as to Plaintiff's Exhibits 8-13;

(7) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, **DISMISSING** the complaint with prejudice;

(8) On or before **February 22, 2013**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(9) Each party shall bear its own costs.

> /s/Lynn J. Bush
> LYNN J. BUSH
> Judge